IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DANNY CORRAR,

        Defendant.

DOCKET NO. 1:03-CR-444-JEC



FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 2 2 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## O R D E R   &   O P I N I O N

This case is presently before the Court on defendant's Motion for Judgment of Acquittal [95].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Judgment of Acquittal  should be **GRANTED in part and DENIED in part.**

### BACKGROUND

This is a case about an attempt to collect on a gambling debt. The United States alleges that Danny Corrar ("Defendant"), Patricia Affatigato ("Affatigato"), and Mikey Glorioso ("Glorioso") are "agents" for PlayWithAl.com ("PWA"), an online sports book operating out of the Netherlands, Antilles.  (T2-41-42, 45-46).  All three, the Government asserts, were involved in an effort to collect a debt from

Larry Parker ("Parker"), a Georgia resident, and himself an agent of PWA. (T2-280). Affatigato was not before the Court at trial. (T1-22). Meanwhile, this Court entered a judgment of acquittal on the only count with which Glorioso was charged, thereby dismissing him from the case. (T3-520). The remaining charges against defendant, however, went before a jury, which convicted him of violating the Travel Act, 18 U.S.C. §1952, and the Wire Act, 18 U.S.C. § 1084.

Both counts stem from defendant's efforts to collect an outstanding debt from Parker. Parker is a bar manager who first began betting with PWA when he lived in Florida. (T2-374). In June of 2002, Parker moved to Georgia, where his former contact with PWA put him in touch with defendant, a resident of New York, who, together with Affatigato, operate a children's entertainment business. (T1-45). Defendant set Parker up as an "agent" of PWA, providing him with ten account numbers which he could distribute to his friends and customers. (T2-280). This scheme did not require Parker to personally receive or transmit his friends' wagers. (T2-281). Parker testifies that he was initially reluctant to hand out account numbers to his friends. (T1-283). This reluctance was apparently justified, because his friends lost money, and by the summer of 2002, Parker found himself on the hook to PWA for at least $20,000. (T-299).

AO 72A
(Rev.8/82)

In response to his debt problems, Parker turned to the FBI, who helped him engage in wiretapping of his phone conversations with defendant and Affatigato. Parker contends that he never attempted to collect money from his friends to pay back his debt to PWA. (T2-293-94). In November of 2002, defendant visited Parker at his workplace, where Parker says defendant tried to collect the debt and became agitated and angry. (T-395). In June of 2003, defendant again visited Georgia, this time accompanied by Glorioso, planning to meet Parker and to collect the debt. (T3-435). The meeting, however, was a sting, and both defendant and Glorioso were arrested. (T-473).

## DISCUSSION

### I. The Travel Act

Count One of the indictment alleges a violation of the Travel Act. The Travel Act, codified at 18 U.S.C. § 1952, identifies as subject to criminal sanctions "[w]hoever travels in interstate. . . commerce. . .with the intent to. . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, . . . and thereafter performs . . . any of the acts specified." A Travel Act conviction thus requires: 1) an unlawful activity, 2) knowledge by the defendant of the unlawful activity, and 3) use of interstate commerce to facilitate the carrying out of the unlawful activity. *U.S. v. Corona*, 885 F.2d 766, 771 (11th Cir. 1989). The United States has

3

failed to prove a violation of the Travel Act count because it demonstrated neither an underlying unlawful activity nor facilitation.[1]

### A.    The Defendant's Position

Count One of the Government's indictment alleges that the unlawful activity underlying the Travel Act conviction is a violation of O.C.G.A. § 16-12-22, Georgia's statute barring commercial gambling. (Indictment [1]). O.C.G.A. § 16-12-22 provides that "[a] person commits the offense of commercial gambling when he intentionally does any of the following acts:

> 1.    Operates or participates in the earnings of a gambling place;
> 2.    Receives, records, or forwards a bet or offer to bet; [or]
> 3.    For gain, becomes a custodian of anything of value bet or offered to be bet."[2]

The unlawful activities underlying a Travel Act violation must be "in violation of the laws of the State in which they are committed or of the United States."   18 U.S.C. § 1952.   This court must therefore

---

[1]   Literally speaking, the Government also fails to satisfy the second prong of the test described in *Corona.* Because the Government has not demonstrated "an unlawful activity," it necessarily cannot demonstrate "knowledge of the defendant of the unlawful activity." However, there is sufficient evidence to establish that defendant was aware of Parker's activities, regardless of their legality.  Thus, if the Government satisfied the first prong of the test, it would satisfy the second as well.

[2]   The statute proscribes four additional acts, not at issue in this case.

4

consider whether there is evidence of any acts committed in Georgia, which acts would constitute a violation of O.C.G.A. § 16-12-22.

Defendant alleges that the United States failed to present evidence that Parker or anyone else committed acts in Georgia that would constitute a violation of Georgia's commercial gambling statute. According to the defendant, "[t]he only way Parker could have violated the Georgia statute is if he received, recorded or forwarded bets to Corrar or PWA, or if he was acting as a custodian of money bet by others." (Def. Corrar's Br. in Supp. of His Mot. for J. of Acquittal ("Def. Br.") at 4-5). The evidence adduced at trial showed that Parker provided account numbers to several of his friends and customers. (T2-288-89). These friends, however, did not place bets through Parker. Instead, they called PWA directly or used the company's website. (T2-297). This evidence does not establish that Parker "receive[d], record[ed], or forward[ed]" any bets. O.C.G.A. § 16-12-22(2).

However, despite defendant's characterizations, receiving bets is not the "only way" Parker could have violated the Georgia statute. (Def. Br. at 4-5). O.C.G.A. § 16-12-22(a)(1) covers anyone who "participates in the earnings of a gambling place." As an agent of PWA, Parker was entitled to collect a percentage of each losing bet any of his friends played on PWA accounts assigned to Parker. (T2-281). Had Parker collected any money from his friends, he would have

5

been entitled to a portion of these earnings.  (Id.)  It is thus possible that Parker meets the requirements of O.C.G.A. § 16-12-22(a)(1).

Unfortunately, there is no Georgia case law defining what it means to "participate[] in the earnings of a gambling place."[3]  This phrase is susceptible to multiple interpretations.  On the one hand, participating in earnings could require that the participant actually receive the earnings of the business.  This sense is what courts mean when they refer to a partnership agreement, corporate stock, or security creating "the right to participate in . . . earnings" of a business.  *See, e.g. Cent. States, Southeast and Southwest Areas Pension Fund v. Creative Dev. Co.*, 232 F.3d 406, 425 (5th Cir. 2000) (partnerships); *Himmel v. C.I.R.*, 338 F.2d 815, 818 (2d Cir. 1964) (stock); *Richmond, Fredericksburg and Potomac R. Co. v. C.I.R,* 528 F.2d 917, 918 (1975) (securities).  Entitlement to the earnings of a business creates a "right to participate." Participation itself is the actual act of receiving the earnings.

On the other hand, "participate[] in the earnings of a gambling place" may refer more broadly to merely seeking to profit in a gambling place's successful operation.   This interpretation is

_____

[3]  The commercial gambling statutes of Texas and Wyoming employ similar language as O.C.G.A. § 16-12-22(1), but their case law is equally unilluminating.

AO 72A
(Rev.8/82)

possible if "participates" is read to mean "to take part in something" and "earning" is read to mean "the act or process of acquiring." Webster's Third New International Dictionary Unabridged 1646, 714 (1986).

The former interpretation is the more natural reading of the statute. First, "earnings" is used in its noun form. This fact is apparent both because it appears as a plural, and because it does not take a direct object. If "earnings" referred to "the act or process of acquiring," it would not need an "s," and it would be followed by a description of what it was that was being acquired, e.g. "a profit." "Earnings" consist of "[r]evenue gained from labor or services, from the investment of capital, or from assets." Black's Law Dictionary 548 (8th Edition 2004). Earnings are thus things, not acts or processes. The best reading of "participates," then, is not "to take part in something" but to "partake," which can mean "share in" or "receive a portion." Webster's Third New International Dictionary Unabridged 1645-46 (1986).

Second, this interpretation fits with the statute as a whole. The entirety of O.C.G.A. § 16-12-22(a)(1) reads "[o]perates or participates in the earnings of a gambling place." That "participates in the earnings of a gambling place" appears after the conjunction "or" indicates that it is meant to capture a type of conduct that "operates" does not. Read in this light, it appears

7

that the intent of the phrase is to foreclose a defense by a mischievous investor who bankrolls a commercial gambling operation but then claims, when faced with prosecution, that he did not "operate" the enterprise.   If O.C.G.A. § 16-12-22(a)(1) instead captured anyone who had the potential to profit from gambling, the other six subsections of O.C.G.A. § 16-12-22(a), which define additional acts constituting commercial gambling, would be rendered superfluous.

This Court need not resolve the meaning of this phrase definitively, however, because O.C.G.A. § 16-12-22(a) requires that a person "intentionally" participate in the gambling place's earnings. There is no indication in the record that Parker sought to keep a share of either the defendant's or PWA's earnings.   While Parker was entitled to a share of the losing bets played on his accounts, he insists that he never attempted to collect those bets from any of his friends. (T3-386-87).   It appears that Parker never intended to profit from his agent status at all.   He originally duplicated his own bets on different accounts, only enlisting friends to use his spare accounts at the defendant's insistence.   (T2-288-89).   No evidence at trial contradicts Parker's testimony, and there is nothing to suggest that he either intended or attempted to share

8

in defendant's or PWA's earnings, much less that he actually did so.[4] This Court thus agrees with the defendant that Parker did not violate the underlying state law named in the indictment.

The Government also cannot demonstrate facilitation. To facilitate an unlawful activity, the unlawful activity must be part of an "ongoing business enterprise." *United States v. Corona*, 885 F.2d 766, 771 (11th Cir. 1989). In a gambling case, the ongoing nature of the enterprise can be demonstrated by evidence of gambling after the last date charged in the indictment. *United States v. Jones*, 642 F.2d 909, 912 (5th Cir. April 17, 1981).[5] Here, it is clear that Parker had no intention of placing bets with PWA at the time of defendant's visit. Parker had already contacted federal agents, and defendant had frozen Parker's account. (T3-304, 396).

---

[4] The Court notes that Parker's testimony, even standing alone, is rather incredible. According to Parker, he let a group of casual friends bet on his accounts as often as they wished on whatever events they chose, and, instead of seeking reimbursement when they lost, simply covered their mistakes out of his own pocket. Nonetheless, the Government presumably did not want to discredit its own witness, and none of the defendants had an incentive to contradict this component of Parker's story. Absent even so much as an assertion, much less specific evidence, that Parker's statements were unbelievable, they are not so preposterous that they can be rejected outright as false.

[5] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

9

**B.    The Government's Lack of Response**

The defendant's argument appears correct on its face.  Further, that the Government did not submit a brief in opposition to defendant's motion, in order to clarify its position, suggests that the Government does not disagree with defendant's argument.  At the close of the Government's case, the prosecutor appeared to contend that it is not Parker, but the defendant himself, who committed the underlying illegal activity.  (T3 - 504).  However, the Government cannot use Georgia's commercial gambling statute to prove that the defendant's gambling operation is an illegal activity for purposes of the Travel Act because the gambling operation took place in New York (or in the Netherlands, Antilles), not in Georgia.  The plain text of 18 U.S.C. § 1952(b) requires that the "unlawful activity" be "in violation of the laws of the State *in which they are committed* or of the United States." (Emphasis added).

To be clear, it is not the case that the United States must always demonstrate a violation of the law of the state that was the destination of defendant's travel (or the termination point of the interstate facility).  *See, e.g. Perrin v. United States*, 444 U.S. 37 (1979) (ordering gravity maps by placing telephone call from Louisiana to Texas satisfied the requirements of the Travel Act where the order furthered a commercial bribery scheme under Louisiana law).  Nor must the United States always demonstrate a violation of the law

10

of the origin state. *See, e.g. Erlenbaugh v. United States*, 409 U.S. 239 (1972) (importing scratch sheets from Illinois to Indiana to use in a bookmaking operation violates the Travel Act where the underlying operation violated Indiana law). The Government can demonstrate that the underlying activity violated the state law of whatever state in which that activity occurred. It simply may not charge in the indictment a violation of the law of State A, and then contend at trial that the underlying illegal activity occurred in State B.

Despite the apparent mismatch between the Government's position and the text of the Travel Act, the United States' charge is not necessarily dead on arrival. The Government could attempt to vindicate its claim on any of several theories. For example, the Supreme Court has cautioned courts against giving controlling effect to state classifications of offenses where such a reading will result in uneven application of the Travel Act. *United States v. Nardello,* 393 U.S. 286, 294 (1969). Meanwhile, a line of cases from this circuit suggests that prosecution under the Travel Act "is not restricted to state law definitions of the unlawful activity. It can prevail upon showing that the acts fall within the generic term charged." *United States v. Jones*, 642 F.2d 909, 913 n. 5 (5th Cir. April 17, 1981) (citing *United States v. Prince*, 515 F.2d 564, 566 (5th Cir. 1975); *United States v. Conway*, 507 F.2d 1047 (5th Cir.

AO 72A
(Rev.8/82)

1975)).   Finally, dicta from at least one Eleventh Circuit opinion could plausibly be read to imply that where a defendant promotes, but does not engage in, an illegal activity in a state, that promotion alone satisfies the jurisdictional requirement of the Travel Act. *United States v. Griffin*, 699 F.2d 1102, 1106 n. 8 (11th Cir. 1983).

The Government, however, has not made any of these arguments, and this Court should not do so for it.   Absent a clear defect in defendant's argument, it is not the appropriate role of a judge in an adversarial system to construct a novel argument to defeat a party's motion.   Nor would it be equitable to defendant, who cannot submit a reply brief to an opposition never filed.   Therefore, defendant's Motion for a Judgment of Acquittal on Count One of the indictment is hereby **GRANTED**.

## II.   The Wire Act

Count Three of the indictment alleges a violation of the Wire Act. The Wire Act, codified at 18 U.S.C. § 1084, provides that:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest. . . shall be fined under this title or imprisoned not more than two years, or both.

Defendant asserts that the Wire Act does not reach his conduct for two reasons.   First, he contends that he was not "engaged in the

12

business of betting or wagering."   (Def. Br. at 10)   Second, he

business of betting or wagering." (Def Br. at 10). Second, he contends that the information he provided Parker did not "assist[] in the placing of bets or wagers." (Def Br. at 15). Neither of these arguments is persuasive.

### A.    Engaged in the Business of Betting or Wagering

Defendant's contention that he was not "engaged in the business of betting or wagering" is based on the observation that Wire Act prosecutions "have historically been limited to persons involved in actual bookmaking activities." (Def. Br. at 11). Even if this characterization of the history of Wire Act prosecutions were correct, it would not prevent the United States from prosecuting other defendants who did not engage in bookmaking, but whose acts are prohibited by the statute. That the United States has often used the Wire Act to prosecute bookmakers does not estop the Government from bringing charges against other persons whose conduct the Act criminalizes. Neither the text of the Wire Act nor the case law interpreting it requires the narrow reading that the defendant suggests. If Congress sought only to criminalize bookmaking, "being engaged in the business of betting or wagering" would simply read "receives bets or wagers." Each business is not comprised of a single job. Complex operations involve division of labor. Insisting that "the business of betting and wagering" is conducted solely by those individuals who actually accept bets is like saying that "the

13

business of movie making" is conducted solely by camera men.  Yet, actors, directors, and producers clearly have important roles in the film industry.

United States v. Cohen, 260 F.3d 68 (2nd Cir. 2001), the most famous internet gambling case to date, so concludes.  In Cohen, the Second Circuit affirmed the conviction on Wire Act charges of the founder and President of the World Sports Exchange, a successful online sports book based in Antigua.  Id.  Defendant contends that this case is inapplicable, because Cohen was "running the show," whereas defendant is, at most, a middle man.  Clearly, Cohen was not a "bookie" in the sense that defendant has used the term, because he did not personally accept bets or wagers from his customers.  Within two years of founding his company, World Sports Exchange was receiving over 60,000 calls per month.  Id. at 70.  Obviously, Cohen could not have handled this call volume himself.  Instead, Cohen was a manager and promoter of his business, farming out the actual receipt of bets to others.  The evidence at defendant's trial was sufficient to conclude that he engaged in similar management and promotion activities, albeit on a much lower scale that did not approach the level of success enjoyed by Cohen.

Defendant's attempt to reconcile Cohen with cases permitting the prosecution of individual bookies is unpersuasive.  Under defendant's theory, both individual telephone operators who accept bets over the

14

phone and the person "running the show" are subject to criminal sanction, but anyone who falls in between these two points is entirely off the hook.   (Def. Br. at 12).   Investors, managers, promoters, and agents are not liable under defendant's theory, even if they did far more to spread the flow of illegal gambling than did individual telephone operators.   This restriction does not flow from the text of the Wire Act, nor is it necessary.[6]   In this case, the Court instructed the jury that for defendant to be engaged in the business of betting, he must have "engaged in a regular course of conduct or series of transactions involving time, attention and labor devoted to betting or wagering for profit, rather than casual, isolated or sporadic transactions."   That instruction serves to protect a defendant whose connection to the business of gambling is either attenuated or occasional.

This Court agrees with the defendant that the facts of this case bear some similarity to those of *United States v. Truesdale,* 152 F.3d 443 (5th Cir. 1998).   However, also like this case, much of *Truesdale*

---

[6]   The cases that defendant cites to the contrary simply create a circularity.   While several of them do in fact suggest that the Wire Act deals with "bookmakers" or "bookies," each case then defines those terms to include "persons engaged in the business of betting and wagering."   *E.g. United States v. Sellers,* 483 F.2d 37, 45 (5th Cir. 1973); *United States v. Marder,* 474 F.2d 1192, 1194 (5th Cir. 1973); *United States v. Anderson,* 542 F.2d 428, 436 (7th Cir. 1976).   In other words, these cases hold only that whomever it is that the Wire Act covers could properly be labeled a bookmaker, and vice-versa.

AO 72A
(Rev.8/82)

turned on the narrowness of the Government indictment. In *Truesdale*, the defendants were charged under 18 U.S.C. § 1055. That statute, like the Travel Act, requires an underlying illegal activity. 18 U.S.C. § 1055. The illegal activity specified in the indictment was "bookmaking" under § 47.03(a)(2) of the Texas Penal Code. *Truesdale*, 152 F.3d at 447. Yet, the Fifth Circuit concluded that the Government had not proved bookmaking. *Id.* at 447-50. It was this language in the indictment, not any limiting language in the Wire Act, that led the Fifth Circuit to reverse the defendant's conviction. *Id.* In fact, the Fifth Circuit explicitly recognized that transactions other than the actual receipt of bets may have been "essential to the overall [gambling] operation," implying that the business of gambling is more than the mere receipt of bets. *Id.* at 449 (emphasis removed).

**B.    Information Assisting in the Placing of Bets or Wagers**

As noted, the Wire Act requires, as elements of the offense, that one be engaged in the business of betting or wagering and use a wire communication facility (telephone) for the transmission "of bets or wagers or *information assisting* in the placing of bets or wagers..." *Id.* at 12 (emphasis added). Defendant argues that the information he provided to Parker did not assist Parker in placing bets. (Def. Br. at 15).

As noted, utilizing a telephone, defendant provided Parker with

16

account numbers that allowed him to place bets with PWA.  (T-280).
Admittedly, in proving that a defendant provided "information
assisting in the placing of bets," most prosecutions under this
statute likely reference the information typically offered by
bookies, such as the odds on a particular sporting event.  The Court
cannot say, however, that a defendant who provides the account
numbers that make a bettor's subsequent wager possible has not
provided "information".  Certainly, these account numbers are not
only helpful, but are required to place a bet with PWA.  That Parker
might have been able to gamble by other means or already had account
numbers does not render this information useless.    Therefore,
defendant's Motion for a Judgment of Acquittal on Count Three of the
indictment is hereby **DENIED.**

## III. Rule of Lenity

Defendant's final argument is that a conviction of defendant on
the Wire Act count for the conduct at issue cannot survive the rule
of lenity.[7]  The rule of lenity states that "due process bars courts
from applying a novel construction of a criminal statute to conduct
that neither the statute nor any prior judicial decision has fairly

---

[7] Defendant also argues that his conviction under the Travel Act
violated the rule of lenity.  As the Court has granted defendant's
motion for judgment of acquittal on the Travel Act count, it does not
have to reach defendant's lenity argument concerning the Travel Act
count.

AO 72A
(Rev.8/82)

disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Applying the Wire Act to defendant's conduct cannot be termed a "novel construction" of the statute. The very first words of that statute read "[w]hoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate [] commerce of . . . information assisting in the placing of bets" is guilty of a crime. 18 U.S.C. § 1084(a). The Government presented evidence that the defendant used wire communication facilities to encourage other people to bet, to assist them in placing bets, and to encourage them to recruit new bettors. It is "reasonably clear" that these actions could constitute "the business of betting and wagering." *Lanier*, 520 U.S. at 259. Moreover, the jury instruction given was arguably more restrictive than a plain reading of the statute might require. As noted, the Court instructed the jury that for defendant to be engaged in the business of betting, he must have "engaged in a regular course of conduct or series of transactions involving time, attention and labor devoted to betting or wagering for profit, rather than casual, isolated or sporadic transactions."

Defendant's more general argument that many people are unsure whether internet gambling is illegal does not change this analysis. Admittedly, there is some practical resonance to defendant's argument

18

that it might not be obvious to the average person, on first blush, that defendant's conduct violated federal law.   As the Government conceded, there is a dearth of cases in which defendants have been convicted under the Wire Act as a result of internet gambling, notwithstanding the fact that internet gambling appears to be quite widespread in this country.   At trial, *Cohen* was the only case to which either party could cite.   Moreover, as mentioned during trial, there was, at that time, a bill pending in the United States Senate to make payment for internet gambling illegal.   (Def. Br. at 15 n.3.) Although not dispositive, it appears that some members of Congress are likewise uncertain that existing law adequately proscribes internet gambling.   Indeed, during the trial, this Court questioned the prudence of the prosecution, given the arguable uncertainty of the law, the *de minimus* scope of the defendant's activities, and the less than laudatory conduct and demeanor of the "victim" of the crime, Mr. Parker.

Notwithstanding the above observations, the Court concludes that defendant's conduct cannot be absolved through application of the "rule of lenity."   First, as noted, there is at least one published case that has held that internet gambling operations can run afoul of the law: specifically, *United States v. Cohen*, 260 F.3d 68 (2nd Cir. 2001).   In *Cohen,* the Second Circuit specifically rejected a rule of lenity defense under 18 U.S.C. § 1084.   *Id.* at 76-77.

19

Moreover, even if internet gambling were permissible under state law, using interstate wire communication facilities to promote it would not be.  This is why the Wire Act, unlike the Travel Act and 18 U.S.C. § 1055, does not require an underlying violation of state law. As this circuit has explained, "assistance to the states directly was only part of the reason for enactment of section 1084.  This section was part of an omnibus crime bill that recognized the need for independent federal action to combat interstate gambling operations. . . this series of legislation does not stand alone, but appears as part of an independent federal policy aimed at those who would, in furtherance of *any* gambling activity, employ any means within direct federal control." *Martin v. United States*, 389 F.2d 895, 898 (5th Cir. 1968) (emphasis added).

In short, for the above reasons, the Court **DENIES** defendant's Motion for a Judgment of Acquittal based on the Rule of Lenity.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendant's Motion for a Judgment of Acquittal.  That is, the Court **GRANTS** defendant's Motion for Acquittal as to Count 1, the Travel Act, but **DENIES** it as to Count 3, the Wire Act.

20

SO ORDERED, this 22 day of January, 2007.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

21